**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Matthew Douglas Steele,

Defendant.

Crim. No. 17-143 (JRT/BRT)

**REPORT AND RECOMMENDATION**

---

Katharine T. Buzicky, Esq., Assistant United States Attorney, counsel for Plaintiff.

Reynaldo A. Aligada, Jr., Esq., Assistant Federal Public Defender, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

This matter is before the Court on Defendant's Pretrial Motion to Suppress Statements (Doc. No. 26). On August 9, 2017, the Court held a hearing on the motion at which the parties were represented by counsel. At the hearing, Special Agent Katie Booth from the Minnesota Bureau of Criminal Apprehension ("BCA") testified concerning the circumstances surrounding Defendant's statements that are the subject of the Motion to Suppress Statements. The Government offered and the Court received in evidence several exhibits, including several photographs, a transcript of the February 6, 2017 interview, and a disk containing a recording of the February 6, 2017 interview. The parties

submitted post-hearing briefing as ordered by the Court. (Doc. Nos. 40, 42.) As discussed below, the Court recommends that Defendant's motion be denied.

## BACKGROUND[1]

On February 6, 2017, just after 7:00 a.m., Special Agent Booth and approximately ten other law-enforcement officers executed a search warrant at Defendant's home. (Tr. 9–11.) The search warrant was based on information that child pornography had been downloaded from an IP address at Defendant's home.[2] (Tr. 36.) Special Agent Booth testified that they needed a large team to execute the warrant because they needed the manpower to conduct the search and do other duties (*i.e.*, conduct interviews, take photographs, continue the search, secure the premises, and for computer forensics work) once they were in the house and because when entering a home they do not know exactly how many individuals they may encounter. (Tr. 10–11.) The majority of the officers were from the Minnesota BCA, and a couple deputies were from Ramsey County. (Tr. 10.) The BCA officers were wearing khaki pants, a black polo with the BCA insignia and a badge stitched on it, and raid vests with a big patch on the front that says "Police" in big, yellow letters. (Tr. 11, 38.) They had weapons drawn, and after entry into the home they

---

[1] The following summary is based on Special Agent Katie Booth's testimony provided at the August 9, 2017 hearing, along with the admitted exhibits. Special Agent Booth has worked for the Minnesota BCA for approximately four years, and is currently assigned to the Predatory Crime section where they investigate child-pornography cases. (Doc. No. 39, 8.9.17 Hearing Transcript ("Tr.") 8.) Prior to coming to the BCA, Special Agent Booth had nine years' experience working for the Mankato Department of Public Safety and nine years' experience working for the Hastings Police Department. (*Id.*)

[2] Defendant Steele does not challenge the validity of the search warrant or the constitutionality of the execution of the search warrant.

were holstered to either their hip or on their side. (Tr. 11.) The raid vests were also removed after the initial entrance into the home. (*Id.*) The Ramsey County officers were wearing official uniforms with a badge on the front and a gun on their hip. (Tr. 38.)

Upon arrival, after knocking on the front door, the officers called into the home; Defendant's mother answered, unlocked the front door, and allowed the officers to enter. (Tr. 13.) After entering, Special Agent Booth and her supervisor Special Agent Florell went down in the basement to find Defendant Steele, where his mother had said he would be. (Tr. 13–14.) They proceeded down a hallway to Defendant's bedroom door, likely yelling "Search warrant, Police, Search warrant," pursuant to normal practice. (Tr. 41.) Special Agent Florell then pushed the bedroom door open to enter, but Defendant tried to close the door. (Tr. 15.) Florell put his foot out to stop the door from being shut, and when he did so his foot went through the hollow door. (Tr. 15.) At that point, Special Agent Booth told Defendant that they had a search warrant and that they wished to talk to him. (Tr. 16.) She testified that she wanted things to settle down at that point, so she first allowed Defendant some privacy to get dressed and use the restroom.[3] (*Id.*) She then asked Defendant if they could go outside to have a conversation. (*Id.*) Defendant told Special Agent Booth that was okay. (*Id.*) Special Agent Booth testified that it would have been difficult to conduct an interview inside the house because of the clutter and lack of cleanliness of the home, because Mrs. Steele was in the living room, there were special

3 Pursuant to standard procedure, someone stood outside the restroom door with the door ajar while Defendant used the restroom. (Tr. 43.)

agents using the kitchen table space, one room had cats in it, another room had dogs in it, and the garage was both full and cold due to the weather. (Tr. 17–18.) Therefore, she suggested that they go out to her vehicle, a Dodge minivan,[4] for the conversation. (Tr. 18, 23.) Before heading outside, the officers ensured that Defendant had a coat on and allowed him to grab something to drink. (Tr. 31–32.)

In the vehicle, Special Agent Giguere[5] was seated in the front driver's seat, Special Agent Booth was seated directly behind him, and Defendant was seated in the passenger-side backseat across from Special Agent Booth. (Tr. 24.) The third row in the van was occupied by clothes hanging and other miscellaneous things. (*Id.*) The van had sliding doors on both sides of the vehicle, so each person was seated next to an unlocked door. (Tr. 48–49.) Special Agent Booth sat sideways on her seat so she could face Defendant during the interview; therefore, her holstered weapon was on her side lodged between her body and the seat. (Tr. 25.) Special Agent Giguere's weapon was also probably not visible to Defendant from where they were sitting. (*Id.*) There were several other unmarked police vehicles in the vicinity, as well as a marked forensics van, and there were agents moving back and forth between the mobile forensics lab and the house. (Tr. 26, 47.)

Special Agent Booth introduced herself to Defendant and advised Defendant that he did not have to speak with her if he did not want to, and that he was free to leave.

---

[4] The radios and special equipment in the minivan were tucked away so they were not visible. (Tr. 24.)

[5] Special Agent Giguere worked for the Minnesota BCA. (Tr. 22–23.)

(Tr. 21.) Special Agent Booth then told Defendant he could leave, go back in the house, or take a vehicle once the cars were cleared. (Tr. 22.) Defendant did not tell Special Agent Booth that he wanted to do any of those things. Specifically, the transcript of the recorded interview indicates that Special Agent Booth's exact words were as follows:

> [W]e have a search warrant here today for your house in regards to some, things that we're kind of seeing and I wanted to take a moment to see if you're willing to talk to us about it. Once again, um you are not under arrest. Um if you don't want to talk to me you don't have to . . . Um we'll have you go sit back in the house if you want. Um if you want to leave, you're welcome to do that. Um the vehicles have to be searched and then you'd be eligible to take the vehicle with you or you could walk down the street if you wanted to leave prior to us finishing the search of your vehicles.

(*See* Doc. No. 32, Gov't Ex. 10, 2/6/17 Interivew Transcript ("Tr.") 1.) Special Agent Booth then asked Defendant, "So knowing that you're not under arrest and you don't have to speak with me if you don't want to um are you willing to have a conversation with me?" (*Id.*) Defendant responded, "Sure." (*Id.*)

Special Agent Booth then proceeded to tell Defendant about the information that she had pursuant to the investigation and proceeded with questioning.[6] (*Id.*) The interview lasted for approximately 45 to 60 minutes. (Tr. 32.) During the interview, Defendant made statements (which he now seeks to suppress) that led to the discovery of incriminating evidence. At the end of the interview, Special Agent Booth asked Defendant if she had told him he was not under arrest, and he acknowledged that she had. (Tr. 49.) He also acknowledged that the agents had not threatened or coerced him or

---

6 They discussed that Defendant had been in treatment at Pathfinders and that they believed he was autistic; Defendant stated that he was "high functioning." (Tr. 44.)

made him any promises. (*Id.*) And he confirmed that he understood that he was free to leave. (*Id.*) After the conclusion of the interview (and the discovery of the incriminating evidence), and after a discussion with Defendant's probation agent and Special Agent Booth's supervisor, a different agent removed Defendant from the van and arrested him. (Tr. 32.)

**DISCUSSION**

Defendant challenges the admissibility of the statements he made to law enforcement officers on February 6, 2017, on grounds that he was provided no *Miranda* warnings when they were required. To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning. The warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings need not follow a precise formulation, and the "inquiry is whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* warnings is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. When analyzing whether a particular defendant was in custody at the time of an interrogation, "the ultimate inquiry is simply whether there [was] . . .

restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted); *see also United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) ("To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest."). Although not an exhaustive list, in determining whether a defendant was in custody at the time of questioning, the Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990); *see also United States v. Czichray*, 378 F.3d 822, 827–28 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest"). However, "custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly . . . the ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 827–28. In making this determination, courts must consider the "totality of the circumstances," *United States v. Sanchez*, 676

F.3d 627, 630 (8th Cir. 2012), and ask whether, in light of all the circumstances, "a reasonable person in [the suspect's] position would have felt free to end the interview" and leave. *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation." Interrogation refers to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Here, it is undisputed that Defendant was interrogated. The only question now before the Court is whether Defendant was in custody at the time of the interrogation.

Defendant contends that the statements he made on February 6, 2017, in response to agent questioning must be suppressed because he was subjected to custodial interrogation without a *Miranda* warning. (Doc. No. 40, Def.'s Mem. in Supp. of his Mot. to Suppress Statements ("Def.'s Mem.") 8, 12–22.) He argues that if the Court considers the context in which the interrogation happened, including the events that took place prior to the interrogation, then the Court must conclude the Defendant was in custody at the time of the interrogation. (*Id.* at 11–12.) Specifically, Defendant asserts the circumstances show he was in custody when considering the following:

- his initial contact with law enforcement was early in the morning (while Defendant was still only wearing his boxers);

- the initial contact was by ten government agents wearing badges and weapons entering and scouring his home while executing a search warrant;
- the initial contact was, in particular, by an officer putting his foot through his bedroom door;
- he was then supervised while getting dressed and using the restroom;
- there were numerous law enforcement vehicles outside his home;
- he was told he could take a vehicle only after they had been searched; and
- he was told he could walk down the street if he wanted, but it was below freezing weather at the time.

(*Id.* at 11–15.) Defendant asserts that because he was addressed in this manner and then asked to go outside his home and into a police minivan to speak with agents; because the agents were in uniforms with badges and had guns displayed on their person; because during the interrogation the agents made sure he was aware of his prior offense and prison sentence that was hanging over his head and used other guilt tactics when questioning him; and because he ultimately was placed under arrest after the interrogation, he was subjected to custodial interrogation and should have received a *Miranda* warning. (*Id.* at 13–15.)

This Court disagrees with Defendant and concludes that he was not in custody when he was questioned in the minivan on February 6, 2017, and therefore, his statements to the agents that day need not be suppressed. The first *Griffin* factor weighs in favor of finding Defendant not in custody because the evidence shows that Special

Agent Booth told Defendant that he was not under arrest, that he did not have to speak to agents, and that he was free to leave. This is "powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Czichray*, 378 F.3d at 826; *see also id.* ("[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

The second, third, and fourth *Griffin* factors (*i.e.*, that Defendant had unrestrained freedom of movement during questioning, Defendant voluntarily agreed to respond to questions, and no strong arm tactics or deceptive stratagems were employed during questioning) also weigh in favor of finding Defendant not in custody. The agents asked Defendant if they could go outside to have a conversation, and he agreed. There is no evidence that Defendant was pressured into doing so. The agents allowed time for the situation to settle down after the initial contact with Defendant, let Defendant get dressed and use the restroom, made sure Defendant had a coat on before going outside, and allowed Defendant to get a beverage to bring with. The agents did not restrain him or brandish weapons at him when they asked him to leave his residence or when they were seated in the minivan talking. The unmarked minivan looked similar to any other such vehicle, and the agents ran the engine to provide a comfortable temperature. The agents' raid vests were removed by that time, and their weapons were likely not visible to Defendant during questioning because of the way the agents were seated in the minivan. There were other law enforcement officers on location helping with the search while the questioning in the minivan occurred; however, no officers were stationed outside the

minivan, there were only two officers in the minivan during the questioning, and Defendant was seated next to an unlocked door. Before any questioning began, the agents told Defendant that he was not under arrest, that he did not have to answer their questions, and that he was free to leave. Defendant unequivocally stated that he was willing to have a conversation with the agents.[7] The questioning lasted approximately 45 to 60 minutes, and the agents spoke in a quiet, monotone voice. (Tr. 23.) Special Agent Booth testified that she did not threaten him or raise her voice during the interview. (*Id.*)

At the time of the interview, Defendant was on probation from a previous child-pornography conviction in Ramsey County, Minnesota. (Tr. 27, 34.) At one point during the interrogation, Special Agent Booth discussed with Defendant the fact that she believed he had "time hanging over his head" (*i.e.*, that he could see some jail time or prison time if he is found in violation of his probation conditions). (Tr. 45.) At another point, after Defendant began to laugh, Special Agent Giguere stated, "So if you are confident we're not going to find anything, well I could understand you being cocky and laughing but it doesn't mean we're not going to find [the evidence]. (Doc. No. 32, Hr'g Ex. 10 ("Tr.") 12.) Special Agent Booth then explained that it was not the agents' style to "yell and scream," and they wanted to give Defendant a chance to be honest. (*Id.* at 13.) At yet another point, Special Agent Booth told Defendant that she was a mom and that she tells her kids that we all make mistakes, but that if someone continues to lie "that tells [her] there's something darker in your soul." (*Id.* at 15.) Defendant argues that these

[7] Special Agent Booth recorded the interview. Defendant did not indicate that he was uncomfortable with having the conversation recorded. (Tr. 20.)

interrogation strategies are a form of coercive tactic, which can be indicative of a custodial interview. "Some degree of coercion[, however] is part and parcel of the interrogation process and [ ] the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004). None of the above comments would make a reasonable person in Defendant's shoes believe he could not leave the minivan. Furthermore, the doors to the van were unlocked (Special Agent Booth exited the vehicle at least once during the interview), and no one told Defendant that he could not leave or otherwise tried to constrain his movement. (Tr. 25–26.) Defendant did not ever indicate that he wanted an attorney or that he wanted to stop answering questions. (Tr. 31.) He did not ask for someone to come sit with him, nor did he ask for a break for food or for other reasons. (*Id.*) Therefore, the evidence reflects that Defendant voluntarily agreed to answer the agents' questions, Defendant had unrestrained freedom of movement during the questioning, and the agents did not use strong-arm tactics or deceptive stratagems during the interview. *See Czichray*, 378 F.3d at 829 ("This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators.").

Although the fifth *Griffin* factor (*i.e.*, whether the atmosphere of the questioning was police dominated) is a closer call because Defendant was asked to be interviewed in a small space (a police minivan), rather than in his home, and because there were two uniformed agents in the minivan conducting the questioning with holstered weapons, this

Court concludes the factor does not tip the scale to turn this particular interview into a custodial interview. Here, Defendant agreed to be interviewed in the minivan, the minivan was unmarked and did not visually show any police trappings or tools, the minivan was parked in front of Defendant's home, the agents' holstered weapons likely were not visible to Defendant during the questioning, and the agents' questioning was calm and conversational. *See United States v. Bordeaux*, 400 F.3d 548, 560–61 (8th Cir. 2005) (finding that an interview conducted by two officers in a police vehicle was not coercive).

Finally, although Defendant was ultimately arrested after the interview, which makes the fifth *Griffin* factor weigh in his favor, under the totality of the circumstances of the interview here, it is not enough to turn the interview into a custodial interview, especially when Defendant was reminded at the end of the interview that he was not under arrest, he was not arrested by Special Agent Booth, and he was placed under arrest only after a period of time had elapsed after the interview and after the agents had consulted with Defendant's probation officer and Special Agent Booth's supervisor. *See Huether*, 673 F.3d at 789,793 (concluding an interview was non-custodial where defendant was in bed at the start of a search warrant, he was interviewed for two hours in his bedroom, an officer blocked the bedroom's only exit, and defendant was arrested at the conclusion of the interview); *see also United States v. Brave Heart*, 397 F.3d 1035, 1038, 1040 (8th Cir. 2005) (finding no custody when the suspect was placed under arrest twenty minutes after a two-hour stationhouse interview).

Looking at the facts as a whole, they support the conclusion that Defendant was free to end the interview at any moment and that a reasonable person in his position would not have felt coerced to speak with the agents. There is no basis for this Court to conclude that the time of day, the weather, or the fact that there was an incident at Defendant's bedroom door when the agents were making a protective sweep of Defendant's home transformed the atmosphere of the February 6, 2017 interview in the minivan from a calm, straightforward discussion into a coercive custodial interrogation. Although it was likely alarming for Defendant to wake up to government agents in his home prepared to execute a search warrant, there is no indication that Defendant was subjected to any coercive police action when Special Agent Booth suggested going out to her minivan to have a conversation or when they were situated in the minivan and talked about Defendant's case.

Although true that "the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody," *Griffin*, 922 F.2d at 1348, considering the *Griffin* factors and the totality of the circumstances in this case, this Court finds that Defendant was not in custody at the time of the interview. Therefore, admitting Defendant's February 6, 2017 statements to agents at trial will not violate his Fifth Amendment rights. Accordingly, Defendant's motion to suppress his February 6, 2017 statement should be denied.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Statements (Doc. No. 26) be **DENIED**.

Date: September 20, 2017

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **September 29, 2017**. A party may respond to those objections by **October 9, 2017**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.

**Transcript:** Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.